United States Court of Appeals
For the First Circuit

No. 92-2237

ROBERT B. REICH, SECRETARY OF LABOR,

Petitioner,

v.

SIMPSON, GUMPERTZ & HEGER, INC.,
AND OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION,

Respondents.

ON PETITION FOR REVIEW OF A DECISION OF THE
OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION

Before

Breyer, Chief Judge,

Selya and Stahl, Circuit Judges.

Bruce Justh, with whom Marshall J. Breger, Solicitor of Labor,

Judith E. Kramer, Deputy Solicitor of Labor, and Joseph M. Woodward,

Associate Solicitor for Occupational Safety and Health, were on brief
for petitioner.
David J. Hatem, with whom Maura A. Greene and Burns & Levinson,

were on brief for respondents.
Mark A. Casso, Arthur E. Schwartz, Elizabeth A. Davis, Robert C.

Gombar, Arthur G. Sapper, and McDermott, Will & Emery on brief for The

American Consulting Engineers Council, The National Society of
Professional Engineers, and The American Institute of Architects,
amici curiae.

August 20, 1993

STAHL, Circuit Judge. In this appeal, the

Secretary of Labor ("the Secretary") challenges a decision of

the Occupational Safety and Health Review Commission ("the

Commission") granting summary judgment1 in favor of appellee

Simpson, Gumpertz & Heger, Inc. ("SGH"). We affirm.

I.

Standard of Review

We review the Commission's decision to determine

whether its factual findings are supported by substantial

evidence in the record, 29 U.S.C. 660(a), and whether its

legal conclusions are "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law[.]" 5

U.S.C. 706(2)(A). See also National Eng'g & Contracting

Co. v. Occupational Safety & Health Admin., 928 F.2d 762, 767

(6th Cir. 1991). In making these determinations, we must be

mindful "`that an agency's construction of its own

regulations is entitled to substantial deference.'" Martin

v. Occupational Safety & Health Review Comm'n, 499 U.S. 144,

, 111 S. Ct. 1171, 1175 (1991) (quoting Lyng v. Payne, 476

U.S. 926, 939 (1986)). Where the meaning of a regulation is

ambiguous, the reviewing court should give effect to the

agency's reasonable interpretations, i.e., interpretations

which "`sensibly conform[] to the purpose and wording of the

1. The Commission's Rules of Procedure incorporate by
reference Fed. R. Civ. P. 56. See 29 C.F.R. 2200.61

(1992).

-2-
2

regulation[] . . . . '" Id. at , 111 S. Ct. at 1175

(citation omitted) (quoting Northern Indiana Pub. Serv. Co.

v. Porter County Chapter of Izaak Walton League of America,

Inc., 423 U.S. 12, 15 (1975)). In contrast, no deference is

warranted where the agency's interpretation is inconsistent

with the wording of the regulation. Id. at , 111 S. Ct.

at 1180 ("[W]e emphasize that the reviewing court should

defer to the Secretary only if the Secretary's interpretation

is reasonable.") (emphasis in original).

II.

Factual Background

Viewing the record in a light most favorable to the

Secretary, we summarize the relevant facts. The events

surrounding this litigation arise out of the construction of

the Fuller Laboratories Building ("the project") at Worcester

Polytechnic Institute ("WPI") in Worcester, Massachusetts.

Sometime in 1987, WPI, the owner of the project, hired

Payette Associates, Inc. ("Payette"), an architectural firm,

to serve as project architect. In June 1987, SGH, an

engineering firm located in Arlington, Massachusetts,

contracted with Payette to perform certain structural

engineering services in connection with the project. The

general contractor for the project was Francis Harvey & Sons,

Inc. ("Harvey").

-3-
3

The building structure was to consist of five

floors of poured concrete placed over a base of steel and

temporary metal decking. As general contractor, Harvey was

responsible for generating a set of "shop drawings" for the

metal decking indicating, inter alia, any shoring necessary

to support the decking during the pouring of the concrete.

As design engineer, SGH had a duty to review the shop

drawings submitted by Harvey for conformance with the

project's design concepts and contract specifications.2

On or about July 9, 1988, Harvey submitted the shop

drawings of the metal decking to SGH for review. In

reviewing those shop drawings, SGH made various notations on

the drawings indicating potential trouble spots. One such

notation suggested that additional shoring be placed in the

area adjacent to the building's elevator shaft.

According to the shop drawings, an area on floor 2

of the building was to be composed of metal decking, four and

2. With the exception of a few provisions added by the
parties, SGH's contract with Payette consisted entirely of
the standard form language contained in a document published
by the American Institute of Architects. SGH's contract
specified, inter alia, that SGH would not be responsible for

the "construction means, methods, techniques, sequences or
procedures, for safety precautions and programs in connection
with the [w]ork . . . ." Rather, the contract assigns those
duties to the general contractor: "The [c]ontractor shall
supervise and direct the [w]ork, using his best skill and
attention. He shall be solely responsible for all
construction means, methods, techniques, sequences and
procedures and for coordinating all portions of the [w]ork
under the [c]ontract."

-4-
4

three-quarters inches of concrete, a layer of insulation, and

another three inches of concrete topping ("the multi-layered

area"). The drawings did not indicate, however, the amount

of time that should elapse between the first and second pours

of concrete in this area. SGH made no notations or revisions

concerning the indicated shoring of the metal decking in the

multi-layered area.

On December 13, 1988, Harvey's superintendent, Mr.

Dwight Mitchell, began pouring the first layer of concrete in

the multi-layered area. He planned to pour the first layer

of concrete, place the layer of insulation, and pour the

second layer of concrete topping in one day. After the first

layer of concrete was poured in the multi-layered area,

Mitchell noticed that a section of the metal decking in a

different area of floor 2 was beginning to sag. Concerned

about the amount of deflection, Mitchell telephoned Paul

Kelley, SGH's project manager, at Kelley's office in

Arlington, Massachusetts. Mitchell informed Kelley of the

deflection he had observed and explained his plan for

completing the floor that day. When told that the amount of

deflection was approximately three-eighths to one-half inch,

Kelley stated that that amount of deflection was "normal."

Mitchell then mentioned the multi-layered area, and

Kelley asked him how he planned to proceed. Mitchell

explained that he intended to pour both layers of concrete in

-5-
5

one day. According to Mitchell, Kelley "thought for a

minute" and told him "I don't see any problem with it . . .

." Mitchell testified that, as a result of this

conversation, he "felt assured that it was all safe to just

go ahead as we had planned on doing . . . ."

At some time after this conversation, Mitchell

began pouring the second layer of concrete in the multi-

layered area. The metal decking in the multi-layered area,

however, was not properly shored and could not support the

weight of both layers of wet concrete. As a result, the

metal decking in that area collapsed, injuring five workers.

Importantly, SGH had no employees at the worksite.3 On

March 13, 1989, the Secretary issued a citation to SGH

pursuant to 29 C.F.R. 1926.703(a)(1),4 for failure to

3. The record reveals that SGH employees visited the
construction site on a periodic basis to conduct inspections
and attend meetings.

4. 29 C.F.R. 1926.703(a)(1) provides:

1926.703 Requirements for cast-in-
place concrete.

(a) General requirements for formwork.

(1) Formwork shall be designed,
fabricated, erected, supported, braced
and maintained so that it will be capable
of supporting without failure all
vertical and lateral loads that may be
reasonably anticipated to be applied to
the formwork. Formwork which is
designed, fabricated, erected, supported,
braced and maintained in conformance with

-6-
6

shore adequately a lateral load. The Secretary proposed a

$1000 penalty for the alleged violation. SGH contested the

citation in a letter to the Department of Labor dated April

12, 1989. On June 7, 1989, the Secretary then filed a

complaint against SGH before the Commission, requesting that

the citation and proposed penalty be affirmed.

On September 24, 1990, SGH filed a motion for

summary judgment, arguing that the citation should be

vacated. On November 27, 1990, the administrative law judge

("ALJ") heard oral argument, and on February 26, 1991,

granted the motion and vacated the citation. Subsequently,

on April 11, 1991, the Secretary filed a petition for review

before the Commission. The Commission heard oral argument on

May 28, 1992, and on August 28, 1992, issued a lengthy

decision affirming the ALJ. This appeal followed.

III.

Discussion

Congress enacted the Occupational Safety and

Health Act of 1970, 29 U.S.C. 651-678 ("OSHA"), to "assure

so far as possible every working man and woman in the Nation

the Appendix to this section will be
deemed to meet the requirements of this
paragraph.

The Secretary also issued a citation to SGH pursuant to
29 C.F.R. 1926.703(a)(2) for failure to have the plans for
formwork, including all revisions, available at the jobsite.
The Secretary has, however, withdrawn this citation.

-7-
7

safe and healthful working conditions and to preserve our

human resources[.]" 29 U.S.C. 651(b). To that end, OSHA

placed primary responsibility on employers, those individuals

who oversee and control the work environment, to achieve

compliance with its standards and insure a safe workplace.

See S. Rep. No. 1282, 91st Cong., 2d Sess. 9 (1970),

reprinted in 1970 U.S.C.C.A.N. 5177, 5186 ("Employers have

primary control of the work environment and should insure

that it is safe and healthful.").

Pursuant to OSHA, an employer's duties flow from

two sources. First, OSHA imposes a general duty upon each

"employer"5 to "furnish to each of his employees employment

and a place of employment which are free from recognized

hazards that are causing or are likely to cause death or

serious physical harm to his employees[.]" 29 U.S.C.

654(a)(1). Second, OSHA imposes a specific duty upon

employers to abide by the occupational safety and health

standards promulgated by the Secretary. See 29 U.S.C.

654(a)(2).6

The Secretary has promulgated occupational safety

and health standards, otherwise known as "general industry

5. As defined in 29 U.S.C. 652(5), an "employer" is "a
person engaged in a business affecting commerce who has
employees . . . ."

6. 29 U.S.C. 654(a)(2) provides that "[e]ach employer . .
. shall comply with occupational safety and health standards
promulgated under this chapter."

-8-
8

standards." See 29 C.F.R. Part 1910 (1992). The Secretary

has also enacted industry-specific standards, which, as

authorized by the Act, see 29 U.S.C. 652(10), are borrowed

from previously enacted federal statutes and regulations. 29

C.F.R. 1910.12-.16 (1992).

Indeed, shortly after the Act became effective, the

Secretary summarily adopted a group of federal standards for

the construction industry that had previously been

promulgated under the Construction Safety Act of 1969, 40

U.S.C. 333. See 29 C.F.R. Part 1926 (1992). 29 C.F.R.

1910.12(a) defines the regulatory universe to which these

construction standards apply:

The [Construction Safety Act] standards
prescribed in part 1926 of this chapter
are adopted as occupational safety and
health standards under section 6 of Act
and shall apply, according to the
provisions thereof, to every employment
and place of employment of every employee
engaged in construction work. Each
employer shall protect the employment and
places of employment of each of his
employees engaged in construction work by
complying with the appropriate standards
prescribed in this paragraph.

In the proceedings below, the parties characterized

the dispositive issue in the case as whether SGH's employees

were engaged in "construction work" as defined by the

regulation.7 Relying upon previous Commission precedent,

7. The phrase "construction work" is defined as "work for
construction, alteration, and/or repair, including painting
and decorating." 29 C.F.R. 1910.12(b).

-9-
9

see Skidmore, Owings & Merrill, 5 BNA OSHC 1762 (1977), the

Commission held that design professionals could only be found

liable under Part 1926 to the extent that they exercise

"substantial supervision" over the "actual construction."

The Commission found that SGH's actions could not, even when

viewed in a light most favorable to the Secretary, constitute

"substantial supervision." It therefore affirmed the ALJ's

decision to grant SGH's motion for summary judgment.

After carefully reviewing the record, we agree that

SGH was entitled to summary judgment. However, we base our

conclusion on grounds different than those relied upon below.

See Resare v. Raytheon Co., 981 F.2d 32, 44-45 n.30 (1st Cir.

1992) (noting that we are free to affirm decision below "`on

any ground supported in the record even if the issue was not

pleaded, tried or otherwise referred to in the proceedings

below'") (quoting Chamberlin v. 101 Realty, Inc., 915 F.2d

777, 783 n.8 (1st Cir. 1990)).

The Secretary maintains that SGH can be found

liable under Part 1926 even though it had no employees at the

construction site. In light of the plain meaning of 29

C.F.R. 1910.12(a), we find such an interpretation

unreasonable.

Section 1910.12(a) requires "each employer" to

"protect the employment and places of employment of each of

-10-
10

his employees . . . ." (emphasis added). The dispositive

question, in our opinion, is whether the construction site at

WPI was a "place[] of employment" which SGH had a duty under

OSHA to protect. The record reveals that SGH employees were

not on the jobsite on a daily or even weekly basis. SGH did

not have an office or a trailer at the site. On the date of

the accident, there were no SGH employees on the site, and

when the conversation took place between Kelley and Mitchell

on that morning, Kelley was at his office in Arlington,

Massachusetts. Under these circumstances, we do not think

that the WPI construction site is a "place[] of employment"

which SGH had a duty under OSHA to protect.8

In our opinion, adoption of the Secretary's

interpretation would expand the meaning of the phrase "places

of employment" beyond any reasonable boundaries. For

example, suppose that a construction equipment leasing

company sends an employee to the site to inspect or perform

maintenance upon a piece of its leased equipment, and that

the employee gives gratuitous advice to the user of the

equipment which allegedly causes an on-site accident. Under

the Secretary's interpretation, the leasing company could be

8. We should make perfectly clear that SGH might well have
breached some other legal duty in assuring Harvey's crew that
it was safe to pour the concrete. We express no view on this
point. Our holding, rather, is a narrow one: that OSHA
regulation 29 C.F.R. 1910.12(a), did not require SGH to
maintain a safe construction site at WPI.

-11-
11

liable under an OSHA provision directing that it provide a

safe working environment for its own employees. Simply put,

we cannot, given the plain language of the regulation and the

dictates
ofcommonsense,acceptsuchanexpansivenotionofliability.9

Finally, we have not found, nor has the Secretary

cited, any cases supporting the Secretary's interpretation of

the phrase "places of employment." Indeed, in every case

cited by the Secretary, the employer had employees at the

actual construction site. Providing as much deference as

possible to the Secretary's interpretation, we still do not

see how one could reasonably read the Department's regulation

as he has done. If the Secretary believes broader liability

is appropriate, the solution is simply to amend the

regulation so that it includes places where the employer's

own employees have never worked--assuming, of course, he has

the authority to do so under OSHA (a matter on which we

express no view). It is not to ignore the regulation's

present, more restrictive, language. The Commission's

decision is affirmed.
affirmed

9. We also note that the Secretary's interpretation might
have the perverse result of causing an employer to discourage
his/her employees from making on-site safety inspections for
fear of being subjected to OSHA liability.

-12-
12